J-S01018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.G.M., A.E.S., A.B.M., MINORS | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.J.M., FATHER | : : : : : : | |
| | : | No. 1305 MDA 2021 |

Appeal from the Order Entered September 7, 2021
In the Court of Common Pleas of Schuylkill County Orphans' Court at
No(s): A63-023-21,
A63-024-21, A63-025-21

BEFORE:   BOWES, J., NICHOLS, J., and COLINS, J.*

MEMORANDUM BY NICHOLS, J.:                    **FILED: MARCH 11, 2022**

Appellant B.J.M. (Father) appeals from the orders granting the petitions filed by Appellee the Schuylkill County Children and Youth Services (Agency) and involuntarily terminating Father's parental rights to B.G.M. (born April 2009), A.E.S. (born February 2012), and A.B.M. (born April 2009) (collectively, the children).[1]  Father's counsel has filed a petition to withdraw

---

* Retired Senior Judge assigned to the Superior Court.

[1] As discussed in more detail below, Father filed corrected notices of appeal relating to each trial court docket number, and we consolidated those appeals at the instant Superior Court docket for disposition.

and an ***Anders***/***Santiago***[2] brief.  We affirm and grant Father's counsel's petition to withdraw.[3]

The trial court summarized the procedural history and its findings of fact as follows:

> The Agency has a history of working with the family due to issues of illegal drug and alcohol use, unstable housing, inadequate medical care, and lack of parenting skills.  The . . . children were initially placed under formal kinship care with their maternal grandparents from October 2014, through August 2015.  They were then returned to [M]other's care under a protective order.  The Agency closed the case in March of 2016.  Mother and Father were married during the time of placement.

> In April 2016, the Agency received a report that there were issues about [M]other's care.  She was transporting the children in her car with no driver's license.  Mother was also being evicted and would be homeless.

> The Agency took emergency custody of the children on May 12, 2016.  [The trial court adjudicated the children dependent on June 6, 2016.]  The children were again placed with their maternal grandparents.  They have remained together in that home ever since.

> \*    \*    \*

> The factual findings that follow are based on the credible evidence presented at the hearing and the facts of record.

> The Agency developed Family Service Plan (FSP) goals and action steps for Father.  They have remained in place since the beginning.

---

[2] ***Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009); ***see also In re V.E.***, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending ***Anders*** to appeals involving termination of parental rights).

[3] The children's mother, B.J.S., a/k/a B.J.S.M. (Mother), agreed to the termination of her parental rights, and she is not a party to this appeal.

The first goal was to assess and achieve recovery from drug and alcohol abuse by completing an evaluation; participating in recommended treatments; complying with random drug screens; and eliminating co-dependent relationships. This goal was established due to Father's self-reporting that he had been a drug addict for twenty years. Police reports from 2018, also indicated concerns of illegal drug use. Father admitted to having a long-time addiction but he blamed the Agency for his drug use. He claimed the Agency's involvement in his life caused him to be depressed and turn to illegal drugs.

Father completed an evaluation with the "A Better Today" program in August of 2019. It was recommended that he continue with counselling and attend groups. Father engaged in some services within that program but never successfully completed it. He re-engaged in the program in March 2020, but did not follow through with the recommendations.

Father claimed he completed two rehabilitation programs and was "clean" for over a year, but the Agency never received information about those programs nor proof of successful completion. He recently enrolled in a drug and alcohol program offered in prison.

Father had seven drug screens since May 12, 2016. He had three screens in 2016, two in 2017, and one in 2018. All of the drug screens were negative. He had no screens in 2019, and one in 2020, which was negative.

Father was encouraged to end his relationship with the children's mother. It was a concern to the Agency because it was an "on again, off again" relationship. Also, of concern was the history of domestic violence between the couple. Mother would do well when Father was incarcerated but his release and re-entry into the family would cause a negative effect on her progress.

The second FSP goal was to address mental health issues. The Agency established this goal and action steps for Father due to his reports of "hearing voices." The action steps were to attend a mental health evaluation; complete recommended treatment; and sign releases.

Father reported that he had attended a mental health evaluation with Omni Health. When the Agency checked with Omni Health, it had no record of an assessment. Father never provided proof of a mental health evaluation or treatment.

Father signed no releases.

Father has, not participated in mental health programs in prison.

The next FSP goal was to participate in Agency services by attending scheduled appointments; allowing announced and unannounced visits; keeping the Agency informed of addresses and phone numbers; signing releases; and keeping the Agency informed of all criminal charges and sentencings.

The Agency recommended participation in a domestic violence/batterer's program due to reports by the children and their mother of incidents of violence involving Father. The children reported that they were afraid of Father and that they had witnessed acts of violence against Mother. He pointed a knife at her which resulted in criminal charges in 2016. In 2017, Father beat, punched, and slapped Mother, locked her in a room, and whipped her with an extension cord. Mother obtained a temporary [protection from abuse order (PFA)] but did not attend the final hearing for a permanent one. An additional incident, in 2017, occurred at the Pottsville Motor Inn resulting in charges against Father for strangling mother until she lost consciousness. She eventually dropped the charges against him. In 2018, he was arrested after pushing [M]other to the ground and choking her. He had claimed she was responsible for his hearing "voices." She also dropped these charges. In November 2018, Father took [M]other to the woods and assaulted her with a tree branch. He was charged with kidnapping and other charges, but Mother failed to pursue these charges.

Specifically, to achieve the domestic violence portion of this goal, the Agency required that Father eliminate domestic violence thoughts, actions, and behaviors; practice learned anger management skills; practice positive coping skills; participate in a batterer[']s program; learn to value women; learn that controlling someone is not love; address domestic violence including dependency in relationships; and realize that violence is detrimental to the safety of children.

The Agency made three referrals to Clinical Outcomes Group but Father never attended one in-person meeting. The Agency also made a referral to Family Services Group and offered to pay for the program and provide transportation to the meetings. Father only completed the intake and failed to follow through with counselling or treatment.

Father alleged that he completed a batterer[']s program online but when the Agency tried to confirm that information; it could not. Father was ordered, in May 2020, to attend an "in-person" batterer[']s group but he never completed an in-person program.

The . . . children participated in counseling to address their reactions to the domestic violence issues and their fear of Father. They have successfully completed their counselling. Father was to participate in that counselling with [the] children, but he failed to do so.

Father disputed that there was a domestic violence issue. He argued that even if there was an issue it had nothing to do with being a father to [the] children. He claimed he never hit [the] children and that they did not witness any acts of violence. Father's testimony in this regard was not credible.

The Agency also recommended attending appointments with the Family Services Unit (FSU). Father signed a release for that information but his cooperation with FSU was minimal.

Father never cooperated with announced or unannounced home visits. He failed to respond to cards left at the home or letters from the Agency to schedule visits.

Father had six addresses since the children's placement in May 2016. He has had numerous periods of incarceration. Every now and then, Father would update the Agency about his address when he came to the office. However, most often, the Agency had to "track" him down.

Father failed to inform the Agency of any of his criminal convictions, periods of incarceration, or length of sentences. He has been incarcerated in local and state prisons for over 20 year[s]. Father has been incarcerated for the majority of the children's lives. He was not incarcerated from October 2019 through August 2020. He is presently incarcerated [for a probation violation] with a minimum release date of this month and a maximum release date of August 2022. Father is unaware of an actual release date. He is also facing new charges of possession of drug paraphernalia, possession of firearms, and receiving stolen property.

The next goal was to maintain a relationship with the children by attending all scheduled visits; reporting any problems during visits; maintaining regular contact through phone calls and

letters; requesting visits when incarcerated; and engaging in counselling and treatment prior to scheduling visits. The Agency developed this goal and action steps due to Father's history of domestic violence, his periods of incarceration, his estrangement from the children, and a need to maintain a relationship with the children.

Father attended almost all scheduled supervised visits in 2010 and 2017. His last visit was June 12, 2017.

In May 2018, it was court-ordered that he participate in the children's counselling sessions as well as in his own sessions before visits would resume. He requested visits after May 2018, but he had not attended counselling as ordered, and thus, no visits could be scheduled. In 2018, there were no visits.

He requested no visits while he was incarcerated.

In September 2019, during a court hearing, he expressed an interest in completing his FP goals and being reunited with [the] children. He was told that he needed to complete the counselling requirement before visits could be scheduled. He failed to complete the requirement so visits were never resumed.

Father sent no letters or cards. He made no phone calls when he was incarcerated nor out of prison. Father alleged that he sent [M]other at least two letters a week for each child and that she was keeping all of them in a box. However, Father also claimed that he was never told that he could write letters to the children. He excused his failure to make phone calls by claiming he was told not to call the maternal grandparents. Father claimed he did not ask about the children when he spoke to [M]other because he was told that she would lose her visits if he did.

The next goal was to obtain and complete job training and employment. Father was to attend job interviews; complete job applications; request transportation from the Agency when necessary; provide pay stubs and proof of employment and maintain employment for at least six months.

Father provided a letter from a temporary agency that showed that he was involved in their services. He reported that he was working for "Harry's-U-Pull-It" but, when the Agency called to verify his employment, it was told that they were not aware of Father's employment. He claimed to work full-time at that job and that he had provided pay stubs to the Agency, as well as other

proof of employment documents. The Agency received no paystubs.

[Father] never requested transportation to a job or for an interview. He alleged that he walked a couple of miles to Harry's every day. Father never requested assistance with job applications or interviews.

The next FSP goal was to meet the children's basic needs by obtaining and maintaining suitable housing; providing a valid lease, and making a budget plan to keep all the bills paid up-to-date.

The Agency was never able to inspect any residence so it was uncertain if any of Father's homes were suitable. He never provided a signed lease for any of his numerous residences.

Father asserted that the Agency was at his house only one time because it would come when he was working full-time and not available. He claimed that he had rented a five bedroom fully furnished home that was appropriate for [the] children. There was no evidence to support that claim.

Father never met with the Agency or its providers to establish a budget and never presented one. He failed to establish that he could meet the basic needs of [the] children.

Father was never ordered to pay child support because he had no ability to pay. He gave no gifts, birthday presents, or holiday items.

Trial Ct. Op. & Order, 9/7/21, at 2-9.

On March 5, 2021, the Agency filed the petitions to terminate Father's parental rights to the children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The trial court appointed Father counsel and held a hearing on August 11, 2021.[4] Carrie Schlegel, the Agency caseworker, testified in

_____

[4] Thomas J. Campion, Jr. Esq., was the guardian *ad litem* (GAL) for the children during the dependency proceedings. The GAL also appeared at the
*(Footnote Continued Next Page)*

- 7 -

support of the Agency's petition. Father participated by video from the State Correctional Institution (SCI) at Camp Hill, and he testified on his own behalf.

On September 7, 2021, the trial court entered the opinions and orders involuntarily terminating Father's parental rights to the children. On October 6, 2021, Father, through his counsel, file a single notice of appeal, which the clerk of the court filed at A63-023-21, as well as a Pa.R.A.P. 1925(a)(1)(ii), (b) statement. The clerk of the court apparently placed copies of the notice of appeal in the records at A63-024-21, and A63-025-21. In light of our Supreme Court's decision in **Commonwealth v. Young**, 265 A.3d 462, 477-78 (Pa. 2021), this Court directed counsel to filed corrected notices of appeal, which have been transmitted to this Court as a supplemental record.[5]

---

termination hearing as GAL and as legal counsel for B.G.M. and A.B.M. The trial court separately appointed James G. Conville, Esq. as legal counsel for A.E.S. based on the GAL's recommendation. **See** N.T., 8/11/21, at 4. **See also** Order, A63-024-21, 4/30/21. We note that the trial court did not enter separate orders naming the GAL as B.G.M. and A.B.M.'s legal counsel before the hearing on the termination of Father's parental rights. **Cf. In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. 2020). However, at the August 11, 2021 hearing, the GAL asserted that he was able to serve as legal counsel for B.G.M. and A.B.M., and that their preferred outcome was termination. N.T., 8/11/21, at 3-4. Significantly, the trial court concluded that there was no conflict in the GAL's representation of B.G.M. and A.B.M.'s legal and best interests. **See** Trial Ct. Op. & Order, 9/7/21, at 1 n.2. Accordingly, we conclude the trial court considered the children's right to counsel pursuant 23 Pa.C.S. § 2313(a). **See K.M.G.**, 240 A.3d at 1236; **accord In re L.B.M.**, 161 A.3d 172 (Pa. 2017).

[5] In order to efficiently facilitate the disposition of this Children's Fast Track matter, we hereby deem Father's separate, corrected notices of appeal at each trial court docket as timely filed *nunc pro tunc* on February 11, 2022, and we *sua sponte* consolidate the appeals at the instant Superior Court docket number, 1305 MDA 2021.

As noted above, Father's counsel has filed a petition to withdraw and an *Anders*/*Santiago* brief that identifies the following issue: "Was the evidence sufficient to establish a ground to terminate [Father's] parental rights and to establish that termination is in the best interest of the children?" *Anders*/*Santiago* Brief at 3.

When faced with an *Anders*/*Santiago* brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. *See In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). As this Court has stated:

> To withdraw pursuant to *Anders*, counsel must:
>
> > 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.
>
> With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

*In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citations omitted). Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in *Santiago*:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*In re Adoption of M.C.F.*, 230 A.3d 1217, 1219 (Pa. Super. 2020) (citation omitted).

"After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted). Our independent review is not limited to the issue discussed by counsel, but extends to "additional, non-frivolous issues" that may have been overlooked by counsel. *J.D.H.*, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it lacks any basis in law or fact. *See M.C.F.*, 230 A.3d at 1220; *accord Santiago*, 978 A.2d at 355.

Instantly, Father's counsel has filed a petition to withdraw that states that he (1) conscientiously reviewed the record and determined that the appeal is frivolous, (2) served Father with a copies of his petition to withdraw, and the *Anders*/*Santiago* brief, and (3) served a letter advising Father of his rights to proceed *pro se* or raise any additional points that Father deemed worthy of consideration. Additionally, counsel attached to his petition to withdraw a copy of his letter that informs Father that he has the right to retain new counsel or proceed *pro se*.

- 10 -

Additionally, a review of Father's **_Anders_**/**_Santiago_** brief reveals that Father's counsel provides a summary of the essential facts and procedural history of the case. Counsel also sets forth his conclusion and reasons for concluding that Father's appeals are frivolous.

For these reasons, we conclude that Father's counsel has substantially complied with the technical requirements set forth above,[6] and we proceed to an independent review of counsel's assessment that the appeals are frivolous because there was sufficient evidence to terminate Father's parental rights.[7] **_See S.M.B._**, 856 A.2d at 1237-38.

### Order Terminating Parental Rights

We begin by stating our standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

[6] Father's counsel did not refer to specific portions of the record that he believes arguably support these appeals. However, we do not find this omission to be a substantial defect in the **_Anders_**/**_Santiago_** brief.

[7] Father has not filed a brief in response to his counsel's petition to withdraw and **_Anders_**/**_Santiago_** brief. We add that the Agency did not file an appellee's brief, although the GAL filed a brief in support of terminating Father's parental rights.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

## Section 2511(a)(8)

We first address the involuntary termination of Father's parental rights under Section 2511(a)(8) because it is dispositive. *See B.L.W.*, 843 A.2d at 384. Section 2511(a)(8) provides as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*   \*   \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

Section 2511(a)(8) sets a twelve-month timeframe for a parent to remedy the conditions that led to a child's removal by the court. *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the twelve-month timeframe has been established, the trial court must determine whether the conditions that led to a child's removal continue to exist, despite the reasonable efforts of the child welfare agency. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the trial court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of the agency's services. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Section 2511(a)(8) also requires a court to assess the needs and welfare of a child. The needs and welfare analysis "under Section 2511(a)(8) accounts

- 13 -

for the needs of the child in addition to the behavior of the parent" and must be addressed separately before considering the best interests of a child. *See In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*). It is well settled that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *M.E.P.*, 825 A.2d at 1276 (citation omitted).

Instantly, our review of the record confirms that the Agency presented clear and convincing evidence that the termination of Father's parental rights was appropriate pursuant to Section 2511(a)(8). First, the children have been removed from Father's care since 2016, nearly five years before the Agency filed the petition to terminate his parental rights. Therefore, there is no dispute that the Agency satisfied Section 2511(a)(8)'s twelve-month time requirement. *See A.R.*, 837 A.2d at 564.

Second, the Agency presented ample testimony that Father failed to progress, let alone meet, his FSP goals. Specifically, Ms. Schlegel, the Agency caseworker, testified that Father either failed to complete or that she was unable to confirm Father's reports that he was engaged in services. *See* N.T., 8/11/21, at 12, 15-20, 22-25, 27-30, 32-37. Therefore, the record contains competent evidence supporting the trial court's findings of fact. Further, we conclude that the trial court properly determined there was no prospect of imminent reunification based on the uncertainty "when, or if, Father would ever be able to parent [the] children or take on the responsibilities of a parent." *See* Trial Ct. Op. & Order, 9/7/21, at 16. For these reasons, we

discern no basis in the law or record evidence to disturb the trial court's determination that the conditions which led to the removal of the children continued to exist.[8] *See I.J.*, 972 A.2d at 11.

Third, the record contains overwhelming evidence supporting the trial court's finding that the children "have waited long enough for . . . Father to get his act together." *See* Trial Ct. Op. & Order, 9/7/21, at 16. As stated above, the children have been removed from Father's care since 2016, and Father failed to make any significant progress to remedy the conditions leading to their placement. Attorney Campion, the GAL and counsel for B.G.M. and A.B.M., and Attorney Conville, counsel for A.E.S., reported that the children favored adoption and the recommendations of the Agency. Furthermore, Ms. Schlegel testified that the children were thriving in their pre-adoptive kinship care home and that the children expressed fear of Father. *See* N.T., 8/11/21, at 30, 37.

For these reasons, we conclude that the trial court properly found that the termination of Father's parental rights best served the needs and welfare

---

[8] We acknowledge Father testified on his own behalf concerning progress in the year before the hearing and obstacles to his progress, including the COVID-19 pandemic. However, Section 2511(a)(8) required the trial court to consider whether the conditions that necessitated the children's removal continued to exist, and not Father's progress, willingness, or ability to remedy the conditions, or the availability or efficacy of the Agency's services. *See M.E.P.*, 825 A.2d at 1276. In any event, the record supports the trial court's findings that Father's testimony was not credible and that "[i]nstead of cooperating with the Agency, Father has consistently placed excuses and barriers to acting in a manner that would result in reunification with [the] children." *See* Trial Ct. Op. & Order, 9/7/21 at 16.

of the children pursuant to Section 2511(a)(8). Accordingly, our review confirms that appeals challenging the trial court's ruling under Section 2511(a)(8)[9] lack any basis in the facts or law and would, therefore, be frivolous.

## Section 2511(b)

We next review the trial court's conclusion that involuntarily terminating Father's parental rights best serves Child's developmental, emotional, and physical needs and welfare pursuant to Section 2511(b), which states:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). We have explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, ... the trial court should consider the importance of continuity of

---

[9] We reiterate that we need only agree with the trial court as to one subsection of Section 2511(a). ***B.L.W.***, 843 A.2d at 384.

relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *See T.S.M.*, 71 A.3d at 268. In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the trial court explained its determinations concerning Section 2511(b) as follows:

> Except for about a year when they were returned to [M]other's care, B.G.M., A.B.M., and A.E.S. have resided together with their maternal grandparents since their placement in 2016. [Maternal grandparents] are committed to their care. They are devoted to meeting their emotional, physical, psychological and financial needs.
>
> The family [at maternal grandparents' home] has a good relationship. The children are being cared for in a safe environment and have a sense of stability and permanency with [maternal grandparents]. They are "thriving" in the maternal grandparents' home. They are active in sports, band, and dance. The maternal grandparents took them to counselling, and they have been successfully discharged. The children do well in school and are looking forward to being adopted. The maternal grandparents are very interested in doing just that.

Father has spent about half of the children's lives in prison due to his own choices. He has not seen them since 2017. Father has done little to develop a bond with the . . . children. Therefore, the court concludes that B.G.M., A.B.M., and A.E.S would not suffer harm if . . . Father's parental rights were terminated.

Trial Ct. Op. & Order, 9/7/21, at 18.

Our review establishes no basis to disturb the trial court's findings of fact and conclusion that termination was in the children's best interests. Initially, we note that while the trial court stated that Father spent half of the children's life in prison, Ms. Schlegel testified that Father was incarcerated for approximately a quarter of the older children's lives, and over a third of the younger child's life. *See* N.T., 8/11/21, at 35. However, Ms. Schlegel testified that Father was in prison for 913 days since the children came back into placement in 2016, approximately 1917 days. *See id.* She continued that Father was not a consistent parent due to time spent in prison. *Id.*

Ms. Schlegel testified that she was not aware of any letters and gift that Father sent letters or gifts to the children during the children's most recent placement, and the trial court credited that testimony, while questioning Father's contrary testimony. *Id.* at 36; Trial Ct. Op. & Order, 9/7/21, at 8. As the trial court further noted, Ms. Schlegel testified that the children were thriving in maternal grandparents' home, completed counseling, engaged in extracurricular activities, and got "good grades." *See* N.T., 8/11/21, at 37; Trial Ct. Op. & Order, 9/7/21, at 18. Ms. Schlegel testified that while Father was initially consistent with visitations, he had not visited with the children since June 2017, because he did not request visits when incarcerated. N.T.,

8/11/21, at 33. Further, Ms. Schlegel noted that in May 2018, the trial court ordered Father to participate in the children's counseling before visits could be scheduled, but that Father did not participate in counseling. ***Id.*** at 32-33. Lastly, we note that Father presented no evidence that the children had any bond to him.

For these reasons, we conclude that the record supports the trial court's findings of fact and conclusions that the termination of Father's parental rights would be in the children's best interests. Moreover, there was no evidence indicating that severing Father's relationship with the children would have a detrimental effect on the children. Accordingly, we agree with the assessment of Father's counsel that an appellate challenge to the trial court's ruling pursuant to Section 2511(b) was frivolous.

In sum, we conclude that Father's counsel properly determined that the appeals from the trial court's orders terminating Father's parental rights to the children were frivolous. Further, our independent review reveals no additional, non-frivolous issues in these appeals. ***See J.D.H.***, 171 A.3d at 908. Therefore, we grant counsel's petition to withdraw and affirm the orders terminating Father's parental rights.

Orders affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2022